IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 09-294-01 |
| MICKAL KAMUVAKA | : | |

### DEFENSE SENTENCING MEMORANDUM

Mickal Kamuvaka, defendant in the above matter, by her attorney, William T. Cannon, Esquire, submits this Memorandum in order to assist the Court in fashioning a sentence under 18 U.S.C. § 3553(a) in its entirety, rather than under the Sentencing Guidelines alone, as required by _United States v. Booker_, 543 U.S. 220 (2005).

**I.    Procedural History**

The defendant was named in a twenty-one (21) count Indictment along with eight (8) others and charged individually with wire fraud (18 U.S.C. § 1343 and 2) (Counts 1 thru 12); healthcare fraud (18 U.S.C. § 1347 and 2) (Counts 13 thru 18); and conspiracy (18 U.S.C. § 371) (Count 19).

On March 3, 2010, following trial, the defendant was found guilty by a jury on Counts 1 thru 19 of the Indictment.

The defendant is scheduled for sentencing on June 10, 2010 at 9:30 A.M. before the Honorable Stuart Dalzell, United States District Judge.

**II.    _Post-Booker_ Sentencing Considerations**

Undersigned counsel will spare this Court the usual recitation of the statutory and

United States Sentencing Guideline principles that govern federal sentencing given this Court's deep and intimate familiarity with all of the underlying principles upon which modern day federal sentencing is based.

### III.   Corrections To The Pre-Sentence Investigation Report

United States Probation Office Karen R. Myslinski has done a yeoman job of preparing the PSR in this case with all its complexities including addressing the several objections and requests for amendment submitted by both government counsel and defense counsel. There are yet, however, a few corrections to the PSR which are important for accuracy sake with regard to this document which is so important for Bureau of Prisons purposes. The Court is asked to order at sentencing that the following errors be corrected:

(1) On page-3 correct the defendant's age to 61 and not 51.

(2) At page-18, paragraph-67, change the last word from "life" to "file".

(3) At page-28, paragraph-119, change the date of "11/29/09" to "11/29/10".

(4) At page-29, paragraph-122, line-4, change "Nambia" to "South Africa".

(5) At page-29, paragraph-123, line-6, change "32" to "31".

(6) At line-8 change "April 28, 1997 " to "August 13, 1980".

(7) At page-30, paragraph-130, line-2, change "per year" to "per semester".

(8) At page-31, paragraph-133, line-2, change "January 2, 1997" to "mid-August, 1997".

### IV.   The Applicable Guideline Range

The probation officer's Offense Level computation is found between paragraphs 106

and 115 of the PSR. Ms. Myslinski has calculated an adjusted offense level of 31.

Undersigned counsel previously advised Ms. Myslinski of his objections to a sixteen (16) level increase in the offense level based on an alleged loss amount in excess of $1,000,000. It remains the position of the defense that a loss amount of more than $1,000,000 has never been proven and remains conjectural on the part of the government. The defense concedes for sentencing purposes, however, that there was sufficient evidence at trial to justify a level increase of twelve (12), but not more than fourteen (14) based on the loss amount and paragraph-109 of the PSR should be so adjusted.

The defense also objects to the two (2) level increase found at paragraph-110 of the PSR. The failure of agency SCOH workers to maintain all of their required appointments does not involve embracing a "conscious or reckless risk of death." Such an increase would only be justified if the defendant was shown at trial to have been aware, in the case of Danielle Kelly or any other child it was providing services to, that their parent or caregiver was abusing them to the point of inviting death and chose not to intervene or to ignore the situation.

Undersigned counsel supports the decision of the probation officer to reject the dual contentions of the government that: (1) the defendant should receive a four-level enhancement under U.S.S.G. § 3A1.1(b)(2) because the offense involved a large number of "vulnerable victims" and (2) that a two level enhancement for "abuse of position of trust" is warranted under U.S.S.G. § 3B1.3. The probation officer's reasoning in denying these requests is sound factually and legally.

It is correct to conclude that the victim of the wire fraud and healthcare fraud proven

in this case was the City of Philadelphia through its Department of Human Services (DHS). In a separate filing the government has extensively argued for the court to award restitution in this case because DHS was the "victim" of the frauds charged and proven. At no point in that filing did the government argue, as they do now, that the "children at risk" must be viewed as victims also. The government cannot have it both ways.

It is properly noted as well that this enhancement as sought was not applied to any of the defendants who have already been sentenced and who are similarly situated. Only a classic example of "disparity in sentencing" could be created by a belated pursuit by the government of an upward adjustment for the remaining defendants as if they should be held out for special punishment only because they chose to go to trial.

As to the government's contention that an enhancement for "abuse of position of trust" is called for, that argument has no applicability here. Every example of defendants abusing a position of public or private trust contained within the Commentary to § 3B1.3 is an individual guilty of individualized crimes. Reference is made, for example, to the "attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician. Likewise at section-2 of the Commentary entitled "Application of Adjustment in Certain Circumstances" once again the two level adjustment is said to apply to, for example, "an employee", a "hospital orderly" or "a volunteer at a charitable organization". In *United States v. Kennedy, Id.*, the court approved a two level enhancement for abuse of position of trust where the defendant, an account manager, acting individually, stole from her client's accounts. In contrast to the holding in *Kennedy* DHS, in funding the

work of MEBH, did not place "special reliance" upon Kamuvaka and her advanced degrees, but upon the agency as a whole to fulfill its contractual obligations. (See that part of the holding in *Kennedy* where the court found (section-V of the Opinion) that the victims **did** place special reliance upon Kennedy).

V.      The Government's Sentencing Memorandum

Undersigned counsel has reviewed the government's submission to this court. After pointing out that Kamuvaka's total maximum sentence is 305-years imprisonment, the government then urges the Court to elevate the defendant's offense level by virtue of the urged upward adjustment and upward variance as earlier described.

It is plain to see that by presiding over this trial the Court, like all other active participants in this dramatic case, has been moved by the death of the young child. It is apparent from the government's filing that in attempting to maximize Kamuvaka's sentence it seeks to capitalize on what it perceives as the Court's obvious and human emotional recoil at the death of the child. Repeatedly the government seeks to remind the Court of D.K.'s "unimaginably horrible death" (page-1); "D.K.'s gruesome death" (page-19); "D.K.'s gruesome death" repeated again at page-19 for emphasis; "the agonizing gruesome death of a helpless child" (page-21); "D.K.'s ghastly death" (page-23); "D.K.'s gruesome condition at the time of her death" (page-24); and "D.K.'s gruesome demise" (page-26). It is not unfair to conclude that the government seeks to move this court emotionally in sentencing the defendant. Despite any and all government contentions to the contrary the government would still have this court view the defendant as someone who ought to be sentenced more for the

death of the child and not committing wire and healthcare fraud. If the defendant is convicted in the State Court of some degree of homicide then that will be the time for her to be punished for the death of the child. This is not that time.

It is an ancient refrain that the prosecution may deliver at trial hard blows, but not unfair ones. The government is plainly guilty in its Memorandum of unfair attacks upon the defendant.

It is blatantly unfair and legally incorrect for the government to tell this court that as "a consequence of the defendant's actions, 14-year-old, D.K. died an unimaginably horrible death". It may be true that had the SCOH worker assigned to the Kelly family carried out his responsibilities that the child's death may have been avoided. But neither he nor anyone at MEBH, including Dr. Kamuvaka, **caused** the child's death.

It is also untrue that Kamuvaka had any involvement with the efforts of Earl McNeill to utilize political influence to salvage the MEBH contract with DHS. Kamuvaka was never present at a meeting with DHS where Vofee Saye Jabateh, CEO of the African Cultural Alliance of North America, was present. When, in October of 2006, McNeill met with DHS about its intended termination of the MEBH contract McNeill brought along Jabateh and Kamuvaka had no part of that. Query then why the government, with no factual basis would asset that "Kamuvaka shamelessly tried to save MEBH's contract by flexing political muscle at a meeting with the DHS Commissioner."

When the government advances that D.K.'s death was preventable they are wrong to assert that this was not "an event deliberately hidden from prying eyes". It is quite obvious

that D.K.'s mother, who plead guilty to murdering the child, took steps to dress the child and cover the child with sheets and bed clothing intended to mask the child's deterioration. It is likewise untrue that D.K.'s bedsores "would have been obvious to anyone paying attention to the child". No visitor to the Kelly home, including the MEBH SCOH worker, the DHS SCOH worker, and the school psychologist who saw the child six (6) weeks before her death, ever had the opportunity to observe the child's exposed person.

The Court should not be misled by the government's statement that Kamuvaka used her position "to make about $60,000 - $80,000 per year". Kamuvaka never made more than $50,000 with MEBH although her part-time positions provided her some additional income.

## VI.   Defendant's Right of Allocution

Dr. Kamuvaka pled not guilty to the charges against her and proceeded to trial as was her right. The verdict of the jury went against her. She has a right to appeal that verdict and intends to do so. Her exercise of her legal rights should not be looked upon as some cold-hearted indifference to the content of the government's evidence at trial or the tragic death of D.K. She is simply pursuing the only avenue available to her to avoid deportation from the Country that she has come to love.

Dr. Kamuvaka is aware of her right to address the Court at sentencing. With all due respect to the Court, she will waive her right to do so. Instead, she will let others speak for her. It is anticipated that a number of people will address Your Honor at sentencing on behalf of Dr. Kamuvaka including (1) Dr. Louise Shoemaker, the former Dean of the School of Social Work at the University of Pennsylvania (2) Jennette Norman, a former probation

officer with the City of Philadelphia (3) her husband, Jay Norman, a former standout basketball player at Temple University (4) two co-volunteers of the defendant with the American Friends Select Group, Kenneth Martin and Jerry Herman (5) Halge Staby-Deaton, the defendant's high school teacher (6) Cheryl Hill, defendant's co-worker at Intercultural Family Services (7) Lorenzo Woodson, defendant's co-worker at the Consortium and (8) former Lincoln University students of the defendant, Will Mega, Nzinga Oneferua, and Dr. Larneque Bartholomew.

### VII.   Sentencing Considerations

The defendant appears for sentencing with no criminal record. I do not believe it is accurate to describe the defendant, as the government advances, as the "de facto" head of MEBH. However, certainly she was the Clinical Director of MEBH and the person with most hands-on responsibility for the performance of the SCOH workers.

It is reasonable to believe that when MEBH first obtained its contract with DHS its goals were noble and the Executive Council of which the defendant was a member were thrilled to have an opportunity to do the most basic kind of social work for which they were well trained. Somewhere along the line the agency began to fail in its responsibilities. It is difficult to tell when this first happened, but it is clear from the testimony at trial that by 2006 there were significant failures on the part of the field SCOH workers to meet their responsibilities.

It may not be denied in the face of the evidence as well that Dr. Kamuvaka herself lost her way. In large part this was directly brought about by the failure of her SCOH workers to

perform as required. When they did so it is obvious that she took steps to cover up their failures. It is not too much to believe that she did this not with the idea of "defrauding the city", but to preserve the image she sought to create of herself as an estimable manager of SCOH services and a true social work professional.

There is little question but that had D.K. not died under the circumstances with which we are all familiar that MEBH would be operating today. That is not too bold a statement. It would be undeniable that every agency with which DHS contracted for SCOH services had its share of failures to provide the level of SCOH services contracted for.

When word of D.K.'s death reached Dr. Kamuvaka it must have struck her s a thunderclap. We know that the correct thing to do would have been to acknowledge the agency's failures to the Kelly family and "take the hit" for that failure even if it meant the termination of its contract with DHS. Regrettably that did not happen. It is all too obvious that Dr. Kamuvaka "panicked" and took those actions described in court to hide the agency's failures. That is why Dr. Kamuvaka was convicted. That is why Dr. Kamuvaka is paying the price of going to jail. That is why Dr. Kamuvaka is facing deportation. That is why Dr. Kamuvaka is facing a homicide trial in the Fall.

Notwithstanding all of this, it may not be said that she is a bad or evil person. In many ways she is a remarkable woman. She grew up in Abject poverty in a tiny African village. She did not see her first school building until she was seven (7) years old. She doggedly pursued a formal education and achieved academic levels that anyone would be proud of.

So many people have written to Your Honor and more wait to speak to you about her.

For Professional Yeboah she has always been "diligent, sincere, conscientious, and dedicated to her work". For Joseph Johnson she has always had an "unyielding demand for excellence". For Nancy Fisher she has always exhibited the Amish values of honesty, integrity, and a strong sense of community". For Pastor Ikpatt she is one of the most "peaceful, loving, and people-oriented Christians that he has ever known". For Jerry Herman she is a "terribly trusting person who believes in the inherent goodness of people". For Vann Marks she is a "dedicated and skilled professional". For Hikuepi B. Katjiuongua she has a "passion and dedication for improving people's lives". For Lynell Crawford she has always approached every task with "a generosity and warm disposition". For Helge Staby-Deaton she has always shown an "astute judgment of the character of others".

I have come to know Dr. Kamuvaka as a polite, respectful, proud, and iron-willed individual who has been devastated by D.K.'s death, the demise of the agency, the loss of respect in her community, and her profound inability to work again in her profession. Although her spirit has reached its nadir she is prepared to enter into federal custody because, in her words, that is what the American legal system, which she respects, has called for her to do. Dr. Kamuvaka made some terrible judgment decisions. She did participate in wire and healthcare fraud. It may not be said of her, however, that she would for a single moment be indifferent to the plight of a helpless child. I have not the slightest doubt that had D.K.'s near-death condition been reported to her, of which she had absolutely no knowledge, she would have rushed to the child's side to give comfort and relief. Her social work background and her personal values would permit no less.

The Court is asked to impose a sentence which is "sufficient but not greater than necessary" to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

    Respectfully submitted,

    /s/ William T. Cannon
**WILLIAM T. CANNON, ESQUIRE**
Attorney for Defendant
Mickal Kamuvaka

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Motion has been served upon the following people this 9th day of June, 2010, by electronic mail:

Vineet Gauri, Esquire
Bea Witzleben, Esquire
United States Attorney's Office
For the Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106-4476

June 9, 2010                                           /s/ William T. Cannon
**Date**                                               **WILLIAM T. CANNON, ESQUIRE**